**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISON**

| | | |
|---|---|---|
| DARRYL LATHAN, | ) | CASE NO. 3:25-cv-01358-CEF |
| | ) | |
| Plaintiff, | ) | CHARLES ESQUE FLEMING |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN THOMAS WATSON, | ) | REUBEN J. SHEPERD |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

On June 13, 2025,[1] Petitioner Darryl Lathan ("Lathan"), a prisoner in state custody, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF Doc. 1). Respondent filed their return of writ on January 16, 2026. (ECF Doc. 9). Lathan then filed a Traverse on February 18, 2026. (ECF Doc. 14). Respondent filed a sur-reply on March 12, 2026. (ECF Doc. 15). The matter is therefore ripe for review.

---

[1] Federal district courts apply the prison mailbox rule, accepting filings as of the date placed in the prison mail system. *See Houston v. Lack*, 487 U.S. 266, 270 (1988).

For the reasons discussed below, I recommend Grounds One, Two, and Three be dismissed as noncognizable; and Grounds Four, Five, and Six be dismissed as procedurally defaulted.[2] I further recommend that the Court find that Lathan has not established actual innocence sufficient to excuse any default. I further recommend that no certificate of appealability issue.

## II. Factual Background

The Ohio Sixth District Court of Appeals set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Lathan rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Sixth District Court of Appeals summarized the facts of Lathan's case as follows:

> I. Background
>
> {¶2} Darryl Lathan was charged in a three-count indictment in connection with the May 16, 2021 shooting death of A.R. He entered a plea of guilty to Count 3, failure to comply with an order or signal of a police officer, a violation of R.C. 2921.331(B), (C)(1), and (C)(5)(a)(i). The remaining counts—Count 1, murder, a violation of R.C. 2903.02(B) and 2929.02, and Count 2, felonious assault, a violation of R.C. 2903.11(A)(1) and (D), and firearms specifications under R.C. 2941.145(A)(B)(C) and (F)—were tried to a jury in August of 2022.
>
> {¶3} The State presented the testimony of Toledo Police Lieutenant Philip Cook; Officers Daniel Welch and Bradley Knapp; Sergeant Aaron Riter; Detectives Scott Mills, Kristi Eycke, and Jeffrey Sharp; University of Toledo Police Officer John Sawicki; Lucas County Deputy Coroner Jeffrey Hudson, M.D.; and A.R.'s brother, D.D. Lathan testified, and he presented the testimony of his cousin, D.G., and his brother, C.J. There were video cameras monitoring multiple angles at businesses near the scene of the shooting and at the hospital where the victim was taken, and there were dashboard cameras in the police vehicles and in the car Lathan drove that night. Extensive video footage was therefore admitted into evidence.
>
> A. The State's Evidence

[2] Contained within Lathan's petition is a request to expand the record. (ECF Doc. 1-1, pp. 50-52). Because Lathan's claims are not cognizable or otherwise defaulted, and therefore not considered on the merits, I deny the request to expand the record as moot.

{¶4} According to the evidence presented by the State, sometime after midnight on May 16, 2021, A.R., D.D. (nicknamed Pooter), and a group of their friends went to the Spotlight Lounge, a nightclub located at the corner of Angola and Reynolds Roads. The club was very crowded when they got there, so they could not get inside. People socialized and drank in the parking lot while waiting to be admitted into the club. Traffic in the parking lot moved slowly, often stopping altogether.

{¶5} About 20 minutes after A.R. and his group got to Spotlight, Lathan arrived with a group of friends and relatives, including C.J. and E.W. He arrived in a BMW that pulled up behind a Jeep that was stopped near the door of the club. A maroon sedan was stopped to the left of the Jeep.

{¶6} Lathan and A.R. knew each other because they grew up in the same neighborhood, but they were not friends. To the contrary, they had been at odds with each other for several years and had argued over Facebook. D.D. claimed that when A.R. noticed that Lathan was there, he told D.D. that he wanted to leave. A.R. then walked away, but D.D. did not know where he went.

{¶7} Video shows that the driver of the BMW tried to reverse shortly after arriving at Spotlight, but other cars were lined up behind the vehicle, preventing it from going very far. The BMW stopped and its occupants exited the vehicle. Some of them approached and greeted people that they knew. Lathan's friend, E.W., knew D.D. from playing sports together in school, and they stopped and talked to each other towards the front passenger side of the vehicle.

{¶8} A.R. had been wearing a mask that night, similar to a ski mask or ninja mask, but initially it was pushed up on his head holding back his dreadlocks. At some point, he pulled the mask down to cover his face. Video cameras recorded a masked A.R. grab a gun out of a fanny pack, cock it, and walk around the maroon sedan and Jeep that were stopped immediately in front of the BMW. Lathan was standing at the driver side door of the BMW. As A.R. walked around the side of the Jeep, Lathan shot at A.R. and struck him, then ran away from Spotlight and across Reynolds Road.

{¶9} A.R. stumbled past the door of the club and fell, dropping the gun. D.D. was holding a bottle of Patron, which he threw in Lathan's direction. E.W. got into the BMW. D.D. ran back towards A.R., grabbed his gun off the sidewalk, and started running in the direction where Lathan ran. As he passed the BMW, he shot into it, shot back towards it again, ran through the parking lot, then ran back towards Spotlight; D.D. estimated that he shot the gun four times. E.W. was struck by one of the bullets D.D. fired at the BMW. D.D. recalled that as he ran past the BMW, he heard other shots being fired. He did not know if Lathan continued firing as he ran away. D.D. maintained that someone took the gun from him as he was leaving Spotlight.

{¶10} A.R. and E.W. were transported by their friends to the University of Toledo Medical Center. Lathan was picked up in the BMW at the corner of South Avenue and Reynolds Road and accompanied E.W. to the hospital. Videos outside the emergency room entrance show that D.D. and Lathan encountered each other there and engaged in a physical altercation that was quickly broken up by law enforcement. D.D. told Lathan, "you're going to die tonight, bitch."

{¶11} Once they were separated, Lathan took off in the BMW. Toledo Police Officers attempted to stop Lathan's vehicle, but he led them on a high-speed chase that ended when his vehicle hit a rock at Rock Spring and Glen Ridge Roads. Lathan got out of the car and fled on foot, but was easily identified because he left a wallet with his credit cards and state identification in the driver's side panel of the BMW. Police also found keys with the first name of Lathan's mother on them, a cell phone that contained email addresses associated with Lathan, and a gun holster on the floor of the front passenger seat. When the vehicle was processed at the impound lot, bullet defects were discovered in the right front bumper of the vehicle, windshield, left rear quarter panel, left front door frame, B pillar of the front left side, and middle armrest. A bullet core was found in the upper decking of the rear window and a fragment of bullet jacketing was found on the floor of the back seat.

{¶12} An autopsy revealed that A.R. suffered a superficial gunshot wound that grazed his right ring finger; a gunshot wound that entered the back of his right leg and exited above the knee, fracturing his femur; and a gunshot wound that entered the upper left side of his back near his armpit and exited through his chest. The gunshot wound to his back went through the left ventricle of his heart and caused his death.

{¶13} E.W.'s gunshot wound was not fatal. D.D. was charged with felonious assault with a firearms specification for E.W.'s shooting, but ultimately entered into a plea agreement with the state. Under that agreement, D.D. entered a plea of guilty to felonious assault, the firearms specification was dismissed, and D.D. agreed to provide truthful testimony at Lathan's trial. D.D. denied that he intentionally shot E.W.

{¶14} Investigators who processed the scene on the night of the shooting observed five vehicles in the Spotlight parking lot; three of the five had been damaged by bullets. The windshield of a Jeep was struck by a bullet. The bullet lay on the dashboard of the vehicle. An Acadia was struck by bullets twice in the front bumper, and a Chrysler 300 had two bullet defects in the windshield. Investigators found the identification of Lathan's brother, C.J., in the Acadia, and the vehicle was registered to Lathan's mother.

{¶15} Numerous shell casings and bullets were also found in the parking lot. In all, 27 casings were collected. There were eight casings and one live round of ammunition clustered in the same general vicinity near a light post. There was another cluster of ten shell casings in front of where the Acadia was stopped, and a

couple more nearby. Additional spent bullets, bullet fragments, and jackets were also found. No casings were found in the area where A.R. was standing, but because it was a crowded scene, casings could have moved around as a result of being kicked as people ran or lodged in tires as people drove off. All the live rounds and spent casings came from nine millimeter weapons. It was determined that the casings collected were fired from three different firearms. None of the firearms were recovered. Some of the shell casings were matched to two other separate shooting incidents in Toledo, but firearms were never located in those cases either and there were no victims in those other shootings. None of the witnesses interviewed ever identified any shooters at the scene other than Lathan and D.D.

{¶16} Investigators interviewed witnesses, collected fingerprints, and swabbed various items for DNA. Many witnesses refused to cooperate. In fact, E.W. provided false statements to police when he was first interviewed in this case and was charged with obstruction. Investigators also used cell phone data to confirm that Lathan was in the vicinity of Spotlight at the time of the shooting and was in the vicinity of Rock Spring and Glen Ridge around the time the pursuit of the BMW terminated.

{¶17} Cross-examination focused on whether A.R. raised his gun to shoot, whether there were shots fired by individuals other than Lathan and D.D., and whether A.R., D.D., and a man referred to as Brown Hat signaled each other in an effort to set Lathan up to be shot. D.D. denied that he and Brown Hat signaled to each other, but he conceded that in the video of the incident, (1) it appeared that Brown Hat signaled to A.R., and (2) A.R. appeared to have raised his gun when he got to the side of the Jeep. D.D. admitted knowing that A.R. had a gun on him, but denied seeing it out that night. In fact, at the time shots were fired, D.D. believed his brother was still in front of the Jeep; he did not know that he had walked behind the cars and rounded the right side of the Jeep. D.D. insisted that he did not act in concert with anyone to try to kill Lathan.

{¶18} Although numerous angles were recorded by the BMW's dash cam and various surveillance cameras in the area, none of the cameras perfectly captured all the participants' movements.

B. Lathan's Version of Events

{¶19} Lathan did not deny that he shot A.R., but he claimed that he did so in self-defense. He presented testimony from D.G. and C.J., then testified in his own defense.

1. Lathan's Cousin, D.G.

{¶20} D.G. testified that he was at Spotlight that night. He walked out to his car to get his vape pen and discovered that Lathan and other relatives were there. At first Lathan was sitting on the edge of the car door. He got out and D.G. and Lathan

shook hands. D.G. saw A.R. and D.D. He considered them to be friends. He denied being aware of any animosity between A.R. and Lathan.

{¶21} D.G. saw that one of his female cousins was talking to D.D., and he stopped and spoke with them. D.G. and D.D. walked toward the door of the club. At some point, A.R. and D.D. were at the door near him, and they were staring at Lathan; A.R. was not wearing a mask at that time. D.G. described that things did not seem hostile at first, but he felt the mood change. People were “talking amongst each other and pointing a certain way.” He said that because he felt tension, he told everyone to “chill” and that they were “all family tonight.”

{¶22} Although he did not know what was going on, D.G. said that he “knew [he] needed to get out of there.” He testified that he was scared and wanted to get out of the way. While standing near the door to the club, he raised his arm to try to get C.J.’s attention because he felt that something was about to happen and he wanted to warn C.J. to “get out of the way.” He said he tried to call C.J., but C.J. did not have his phone. As D.G. pulled on the door to go back inside, shots were fired; he denied that he pointed at A.R. before the shots were fired. He insisted that he did not see the shooter and did not see anyone with a gun.

2. Lathan’s Brother, C.J.

{¶23} C.J. testified that he drove to Spotlight that evening in his mother’s GMC Acadia. Before going to Spotlight, he, Lathan, E.W., and other friends had been at another club. He followed the BMW that Lathan was riding in. The parking lot was crowded and traffic was moving slowly. His vehicle was at a complete stop; they tried to reverse but they were blocked in by other vehicles. They got out of the vehicle and said hi to people they knew.

{¶24} After being there a few minutes, C.J. saw somebody with a gun and a mask, so he started walking the opposite way. He felt fearful for the other people he was with. As he walked to his car, he heard gunshots and hid behind the car. He heard more than ten shots, but did not see the shots being fired. He felt bullets fly by him and hit off the car next to him. He ran towards a field on Reynolds Road and left his car and cell phone at Spotlight. He never looked back after the shots were fired, and he never returned to make sure that his family was okay.

{¶25} C.J. denied knowing that A.R. or D.D. was going to be at the club. He denied knowing that Lathan had a gun that night and did not see him with a gun.

3. Lathan

{¶26} Lathan testified that he and A.R. knew each other from their neighborhood and grew up together. A.R. was two years younger than Lathan. Lathan denied that he had a problem with A.R., but claimed that A.R. had a problem with him. A.R. made threats about Lathan in a music video. A.R. also had others tag Lathan in

social media posts. People told Lathan that A.R. was going to kill him when he saw him.

{¶27} A.R. had been threatening Lathan for a while, so at first, Lathan did not take it seriously. Eventually, Lathan felt threatened. Lathan explained that like D.D., he also goes by the nickname "Pooter." He testified that A.R. made a song with lyrics stating that Pooter "better kill [A.R.] before [he] end[s] up dead," and A.R. also said he was going to rob and shoot Lathan. Lathan claimed that A.R. had a reputation for violence and he is personally aware that A.R. has shot multiple people. He claimed that he feared A.R. and he feared him the night that they were at Spotlight.

{¶28} Lathan arrived at Spotlight in a BMW; E.W. and R. rode with him. His brother arrived behind him in an SUV. The traffic moved slowly. Lathan saw a friend from his neighborhood named Chewy, and Lathan hung out the window to get his attention. Chewy did not come over to talk to him, and this seemed unusual. Chewy leaned in the car ahead of the BMW, looked back at Lathan, gave him a sour look, then shook his head. Lathan then saw A.R. walk out of the club; he was smiling and looked like he was trying to say something to Chewy. A.R. looked over at Lathan and his smile faded. A.R. was not wearing a mask at that point. He disappeared into the parking lot.

{¶29} Lathan wanted to leave. There was a car ahead of the BMW blocking it in, and he told them to move, but could not get through. His brother also attempted to back the SUV out, but the cars behind him prevented them from leaving the line of cars.

{¶30} Unable to leave, Lathan remained in the car at first. His cousin came up to him and hugged him and told him to be careful. Lathan claimed that people started telling him that "they about to shoot your car up." People told him "get your dumb ass out of the car," so he got out by climbing out the window.

{¶31} Lathan maintained that before going to Spotlight, he was not armed with a weapon and there was no weapon in the vehicle. But while he was hanging out of the window, someone asked him if he was "strapped." He said no. He claimed that as he scanned the parking lot for A.R., "a gun end[ed] up on [his] lap, like somebody must have stuffed it" in his lap. He did not know who did this because the music was loud and he was not paying attention at the time.

{¶32} Music was playing in the parking lot, and Lathan danced around in front of the car a little, still looking for A.R. over the cars. He walked the "peripher[y]" of the car because he knew A.R. was "about to pop out of somewhere." A.R. and D.D's friends approached Lathan, so he walked towards them. D.D. is usually neutral when it comes to Lathan and they usually talk when they see each other. The group shook hands with each other.

{¶33} Brown Hat shook his hand, but Lathan said that Brown Hat does not like him. He could see that Brown Hat was carrying a gun on his hip. After shaking Lathan's hand, Brown Hat and his group kept walking and disappeared into the parking lot.

{¶34} Lathan became fearful that he was being set up. One of the people in that group had told Lathan that A.R. was going to kill Lathan when he saw him. He felt that A.R.'s group was "trying to distract [him] while [A.R.] pop up from wherever he popping up from." Lathan shifted to the left and looked for A.R. between the cars.

{¶35} Lathan saw three of A.R.'s friends. One was sitting on a car, dressed in black, and "masked up." He had a gun. Another of A.R.'s friends was "crouched down with a mask on" looking at Lathan from the back of the car. He did not know the third man, but he recognized the other two "from the neighborhood." Lathan testified that these men were known for shooting people.

{¶36} Lathan felt stuck. He wanted to run, but he couldn't because that also would have been dangerous. Also, his wallet and phone were in the car. He turned back around to tell his friends to watch out and pay attention because A.R. would not have any problem shooting them. As he was going back, A.R. "finally pop out from between the cars where the two other people with guns was." A.R. had a mask on and a gun in his hand. They looked directly at each other. Lathan claimed that everyone was looking at him because they knew what A.R. was about to do.

{¶37} Lathan hoped that D.D. or one of his friends would get A.R., but A.R. walked to his left in front of the car and continued to walk. C.J. and E.W. were in that direction talking to D.D. Lathan tried to tell them to get out of the way because A.R. was going to shoot them all. A.R. was trying to get into position to shoot him, and A.R.'s friends were already in position to do so. Lathan was trying to watch all of them. His gun was not yet out. But then, A.R. walked to the curb, peeked back at Lathan, and raised the gun. Lathan was 100 percent certain that A.R.'s gun was cocked. Lathan "hurried up and shot."

{¶38} A.R. would not have seen Lathan's gun because it wasn't out. Lathan hurried up, raised it, and shot. He had recently had shoulder surgery, so he knew it was going to hurt to raise the gun. Lathan claimed he fired it twice. He insisted that A.R.'s gun went off too because he saw bullets fly out. He pointed out in the video where he saw A.R.'s gun spark and identified where he saw smoke from the gun. Lathan maintained that two other people shot at him as well, and he pointed out in the video where the other shooters were located.

{¶39} Lathan described that A.R. kind of ran, tripped over the curb, and went flying. Lathan "ducked off" running, dodging A.R.'s shots, but he did not run instantly because guns were pointed at his face. He ran towards Reynolds Road, all the while hearing "shots going nonstop." He ran across Reynolds, climbed over a

gate, then ran into a trailer park. Lathan said that the gun fell out of his hand sometime when he was running. He lost his glasses too.

{¶40} Lathan believed he had been struck by a bullet. His friend, R., ran across Reynolds too and ran past Lathan. Lathan called his name and R. checked Lathan and determined that he had not been shot. E.W. called R.—Lathan's phone was still in the car. E.W. said he had been shot; Lathan assumed that A.R. had shot him, but E.W. told him it was Pooter (i.e., D.D.). R. ran back to get E.W. and Lathan stayed hiding. R. came back in the BMW to pick up Lathan and they drove E.W. to the hospital.

{¶41} When they got to the hospital, the doors were locked. D.D. and his group were inside the hospital, which confused Lathan because he did not know that anyone in D.D.'s group had been shot. He just thought that A.R. had fallen over the curb.

{¶42} Lathan and D.D. faced off at the door. The door opened from the inside. When it opened, Lathan put his hands up to fight, and so did D.D. D.D. swung at him and bumped him. Lathan could not fight back because of his shoulder injury. He was in pain and he started running away from him. Police officers eventually grabbed D.D.

{¶43} An officer's body camera recorded Lathan tell R. to get D.D. D.D. yelled at Lathan that he was going to kill Lathan and Lathan would die that night. Lathan and R. were outnumbered and D.D. kept breaking free from police. Although Lathan did not see any guns, he knew that people had guns. Lathan told E.W. to go inside and he went to the driver's seat of the BMW and told R. to come with him because he was going to get "fuck[ed] up." R. didn't come, so Lathan just left. He insisted that he left not because he had just fired a weapon at Spotlight, but because he was afraid for his life. He thought D.D.'s group would start shooting. Lathan said he eventually realized that police were chasing him and he regrets not stopping. He pled guilty to charges stemming from the police chase.

{¶44} Lathan claimed that he did not want to shoot A.R., but he feared imminent death or serious bodily harm at A.R.'s hands. This fear extended to his family who were present at Spotlight. He also feared imminent death or serious bodily harm at UTMC.

{¶45} On cross-examination, Lathan testified that A.R. had threatened him face-to-face in the past when they were both at a bar called D'Icon. A.R. told Lathan he would "shoot this mother fucker up." Lathan denied that he had any problem with A.R. He also denied making a rap song talking about how he killed A.R. Lathan claimed that he always went out of his way to avoid A.R., even going to stores that were further away to avoid running into him.

{¶46} Lathan conceded that A.R. did not point the gun at him and did not try to shoot him when he was standing at the closest point to Lathan and would have had the easiest shot. He believes that A.R. was surprised to see him because he had previously been in a different spot. Lathan believes that they were also trying to set up E.W. He debated the suggestion that A.R. would not have shot in E.W.'s direction because E.W. was standing next to D.D.

{¶47} Lathan denied that A.R. had his back to him when he was shot. He described A.R. as being "slanted," looking back at him. He challenged the prosecutor's contention that sparks were not visible from A.R.'s gun. He said that if the recording is played slowly, sparks can be seen, but he conceded that on regular speed, they cannot. Lathan testified that people on the side of the maroon sedan, next to the Jeep, shot at him after he shot A.R.

{¶48} In a jailhouse phone call, Lathan denied shooting A.R. He explained that he said this because he was not legally allowed to possess a firearm and did not know that it would be legal for him to use a firearm in self-defense.

C. The Verdict and Motion for New Trial

{¶49} The jury found Lathan guilty of murder and felonious assault, along with the specifications. Thirteen days later, on August 18, 2022, Lathan sought and was granted leave to file a motion for a new trial. He argued that one of the jurors—Juror #7—engaged in misconduct by failing to disclose that he knew defense counsel.

{¶50} According to Lathan's motion, on August 4, 2022, the wife of defense counsel came to court to watch her husband examine defense witnesses. On her way to the courtroom, she saw a man she had worked with between 2011 and 2014; she did not speak with him. When the jury was led into the courtroom, she realized that the man was seated as a juror on the case. She perceived that he was staring at her, which made her uncomfortable, so she left the courtroom and went home. After she left, her husband called her, and she explained that she left because she knew one of the jurors. She told her husband that she did not speak with the juror and did not know if the juror knew that she was married to defense counsel.

{¶51} The next day, defense counsel called his wife to tell her that the jury had found Lathan guilty. Soon after, Juror #7 direct messaged her on Facebook and said: "1st off it was nice to see you n 2nd husband did nice job for his first case." She did not respond. She looked through her messages and saw that she and Juror #7 had direct messaged on Facebook in 2018. He asked her opinion about a job opportunity and she gave him her advice. He responded "[a]re you taking bf apps and is it free lol[.]" She did not respond.

{¶52} Lathan argued that if he had known that Juror #7 had asked to apply to be defense counsel's wife's boyfriend and "had been rebuffed," he would have wanted

> Juror #7 removed from the jury. He acknowledged that at the time of voir dire, Juror #7 may not have known that he knew defense counsel's wife, but he knew on the third day of trial. Although Lathan's motion did not explicitly allege that Juror #7 was biased or impartial or that he failed to honestly answer questions during voir dire, he cited cases recognizing that a defendant is entitled to an impartial, unprejudiced, and unbiased jury, and that a new trial may be granted where a juror has failed to honestly answer material questions during voir dire.
>
> {¶53} On December 5, 2022, Lathan filed a motion for disclosure of jury information, including the names, addresses, and employer information for each juror. The court denied the motion because it found that there had not been an initial showing of juror misconduct. The motion proceeded to a hearing on December 19, 2022, at which defense counsel testified.
>
> {¶54} In a judgment journalized on January 18, 2023, the trial court denied Lathan's motion for new trial for two primary reasons: (1) prospective jurors were never asked if they knew any family members of the attorneys and defense counsel admitted that he had no cause to believe that the juror knew that defense counsel was married to a person the juror knew; and (2) defense counsel was informed by his wife before closing arguments of her connection to the juror, yet defense counsel did not bring the issue to the court's attention, suggesting to the court that counsel did not actually believe that Juror #7 could not be fair and impartial during deliberations.
>
> {¶55} The court did not allow an additional hearing for Lathan to examine Juror #7 and the other jurors.

(ECF Doc. 9-1, pp. 192-210; *see also State v. Lathan*, 2024 WL 3221526, at *1-8 (Ohio Ct. App., June 28, 2024).

## III. Procedural History

### A. State Conviction

On October 25, 2021, a Lucas County Grand Jury returned an indictment charging Lathan with one count of murder under Ohio Revised Code §§ 2903.02(B) and 2929.02, with a firearm specification, one count of felonious assault under Ohio Revised Code §§ 2903.11(A)(1) and (D) with a firearm specification, and one count of failure to comply with an order or signal of a police officer under Ohio Revised Code §§ 2921.331(B), (C)(1), and (C)(5)(a)(i). (ECF Doc. 9-1,

pp. 7-8). Lathan pled not guilty to the felonious assault and murder charges; before trial, Lathan pled guilty to the failure to comply charges. (*Id*. at pp. 10, 43-45).

On July 19, 2022, Lathan notified the State of his intent to bring forth the affirmative defense of self-defense. (*Id.* at pp. 25-26). On August 4, 2022, Lathan filed a notice of intent to introduce a rap video during trial. (*Id.* at pp. 46-50).

The case proceeded to a jury trial. On August 5, 2022, the jury found Lathan guilty of murder and felonious assault, along with the firearm specifications. (*Id*. at p. 51). On August 18, 2022, Lathan then filed a motion for a new trial based on juror misconduct. (*Id*. at pp. 52-53). On December 5, 2022, Lathan filed a motion for disclosure of jury information. (*Id.* at pp. 64-65). The trial court rejected the motion for new trial on January 17, 2023. (*Id*. at pp. 56-63).

Lathan's sentencing hearing was held on January 19, 2023. (*Id.* at p. 67). The trial court merged the felonious assault and murder charges for sentencing, with the State electing to proceed on Count One. (*Id.* at p. 68). The trial court imposed a mandatory minimum prison term of 15 years to life, with an additional mandatory consecutive term of three years for the firearm specification. (*Id*. at pp. 68-69). The court imposed an additional term of 30 months for the failure to comply charge, to be served consecutively to Count One. (*Id*.). A sentencing addendum from the same day noted that post release control had been imposed in error and entered an order vacating any post release control. (*Id.* at p. 70).

**B. Direct Appeal**

On January 20, 2023, Lathan, through counsel, filed a notice of appeal to the Ohio Sixth District Court of Appeals. (*Id.* at p. 71). He raised three assignments of error:

> Assignment of Error I:
> The trial court erred in excluding relevant evidence of Mr. Lathan's self-defense claim, thereby violating his Sixth Amendment Right to a meaningful defense

> Assignment of Error II:
> Mr. Lathan's conviction was against the manifest weight of the evidence.
>
> Assignment of Error III:
> The trial court erred in denying Mr. Lathan's Motion for New Trial

(*Id*. at p. 84). The state filed a responsive brief on October 10, 2023. (*Id*. at pp. 118-34). On June 28, 2024, the state court of appeals overruled all three assignments of error and affirmed the trial court's judgment. (*Id*. at pp. 150-86; *see also Lathan*, 2024 WL 3221526 (Ohio Ct. App., June 28, 2024).).

In July[3] 2024, Lathan, pro se, filed a notice of appeal to the Supreme Court of Ohio. (*Id.* at 188). On August 1, 2024, Lathan filed a motion to the Ohio Supreme Court to stay the Court of Appeals' judgment until it decided his pending 26(B) motion to reopen his appeal. (*Id.* at pp. 189-91). The State opposed the motion to stay. (*Id.* at p. 229-31). On August 14, 2024, the case was dismissed due to failure to file a jurisdictional brief. (*Id*. at p. 233; *see also State v. Lathan*, 2024-1093, 239 N.E. 3d 416 (Ohio) (Table)). The Ohio Supreme Court denied the motion to stay as moot on August 29, 2024. (ECF Doc. 9-1, p. 232).

Lathan filed a motion for leave to file a delayed appeal on September 13, 2024. (*Id.* at pp. 234-39). The State opposed. (*Id.* at pp. 284-86). On October 29, 2024, the Supreme Court of Ohio denied Lathan's motion for delayed appeal. (*Id*. at p. 287).

**C. Post Conviction Proceedings**

On September 4, 2024, Lathan filed a *pro se* application to reopen his direct appeal under Ohio Appellate Rule 26(B). (*Id*. at pp. 288-99). Specifically, Lathan alleged that appellate counsel should have raised the following three additional claims:

---

[3] The certificate of service provides only the month and year of filing.

> ASSIGNMENT OF ERROR FOUR:[4]
>
> APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO TIMELY PRESENT THE EX CULPATORY VIDEO PURSUANT TO CRIM.R. 16.
>
> ASSIGNMENT OF ERROR FIVE:
>
> APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN COUNSEL FAILED TO PUT FORTH DEFENDANT'S STAR WITNESS.
>
> ASSIGNMENT OF ERROR SIX:
>
> APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL ALLOWED A BIAS JUROR TO BE EMPANELED.

(*Id*. at pp. 290-94).

On November 1, 2024, the Sixth District Court of Appeals denied Lathan's application to reopen his appeal with a written opinion. (*Id*. at pp. 300-15). Lathan did not appeal this decision to the Supreme Court of Ohio.

## IV. Federal Habeas Corpus Petition

Lathan brings six grounds for relief for this Court's review:

> GROUND ONE: Court violated Lathan's Sixth, Fourteenth, Amendment and Due Process right to a meaningful defense.
>
> Supporting Facts: Trial Court denied self-defense evidence in the form of a music video made by the victim – threatening petitioner's life. (see attached memorandum)
>
> GROUND TWO: Convictions are against the manifest weight of the evidence and sufficiency of evidence in violation of the 5th and 6th Amendments.
>
> Supporting Facts: The State did not prove beyond a reasonable doubt that Lathan did not cause the death of the victim contrary to his claim of self-defense. (see attached memorandum)

[4] Lathan numbers his assignments of error in his Rule 26(B) motion consecutive to the three filed in his direct appeal. (*See* ECF Doc. 9-1, p. 290).

GROUND THREE: Trial court deprived Petitioner of Due process of the Law under the 14th Amendment when it failed to order a new trial as result of juror misconduct

Supporting Facts: Trial Court disregarded evidence of juror misconduct; applied wrong standard of review and failed to permit the juror at issue to testify at the hearing. (see attached memorandum).

GROUND FOUR: Petitioner was denied effective Assistance of counsel when counsel failed to timely present exculpatory evidence

Supporting Facts: Trial Counsel failed to timely present the exculpatory evidence of self-defense. (see attached memorandum)

GROUND FIVE: Petitioner was denied his 6th Amendment right to effective assistance of counsel when counsel failed to put forth a material witness

Supporting Facts: Counsel failed to put forth a crucial witness to testify on Petitioner's behalf. (see attached memorandum)

GROUND SIX: Petitioner was denied effective assistance of counsel when counsel Permitted a bias juror to remain seated on the jury

Supporting Facts: Trial Counsel failed to inform the court of the biased juror upon learning of the connection between juror and his wife. (see attached memorandum)

(ECF Doc. 1, pp. 2-14).

## V. Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104-132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to Lathan's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). This is so because

"[s]tate courts are adequate forums for the vindication of federal rights" and AEDPA thus acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013). As such, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455, 125 S. Ct. 847, 160 L. Ed. 2d 881 (2005) (internal citation and quotation omitted).

Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181, quoting 28 U.S.C. §§ 2254(a), (b), (c). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application

> shall not be granted . . . unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

First, clearly established federal law for purposes of AEDPA review includes "the holdings, as opposed to dicta, of [U.S. Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to U.S. Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the

state court decides a case differently than the Court despite both cases having materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), cert. denied, 549 U.S. 1047 (2006). However, a state court does not act contrary to clearly established federal law where U.S. Supreme Court precedent is ambiguous or otherwise unavailable. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision is an unreasonable application of Supreme Court precedent where the state court's adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), cert. denied, 531 U.S. 1089, 121 S. Ct. 808, 148 L. Ed. 2d 694 (2001). Under § 2254(d)(2), a state court's factual determination will stand unless it is objectively unreasonable in light of the evidence presented in state court. *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). "[A] federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Next, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). And, as the U.S. Supreme Court has repeated, "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion . . . ." *Burt*, 571 U.S. at 18. Federal courts must also defer to a state court's judgment on issues of state substantive and procedural law. *Murray v. Carrier,* 477 U.S. 478, 491, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982).

In all, federal habeas corpus relief is a "guard against extreme malfunctions in the state criminal justice systems," and is different in kind from the relief available in direct appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133, 142 S. Ct. 1510, 212 L. Ed. 2d 463 (2022) (internal quotation omitted). Thus, to obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) ("When the state court has not assessed the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

## VI. Procedural Barriers

Before coming to federal court, a state habeas petitioner must overcome certain procedural barriers, including exhaustion of state remedies and procedural default. *See Daniels v. United States*, 532 U.S. 374, 381 (2001). A federal court sitting in habeas review may review claims that were evaluated on the merits by the state court. But claims that were not evaluated by a state court, either because they were never fully presented to the state court (i.e., state court remedies were unexhausted) or because they were not properly presented to the state court (i.e., they are procedurally defaulted) are not available for federal habeas corpus review. *Bonnell v. Mitchel,* 301 F. Supp. 2d 698, 722 (N.D. Ohio 2004), *aff'd sub nom. Bonnell v. Mitchell*, 212 F. App'x 517 (6th Cir. 2007).

**A. Exhaustion**

A petitioner must first give the state courts a "*fair*" opportunity to act on his claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis in original). For a claim to have been fairly presented, the factual and legal basis of the claim asserted by the petitioner must have been raised at each and every stage of state review. *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). It is not enough for the claim raised in state court to be "somewhat similar" to the one raised in the habeas petition or implicate the same facts; the state court must have been called upon to apply the legal principles of the claim now presented to the federal courts. *Jalowiec v. Bradshaw*, 657 F.3d 293, 304 (6th Cir. 2011).

The petitioner also must have presented their "claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Williams v. Anderson*, 460 F.3d 789, 807 (6th Cir. 2006) (quotation marks omitted). In this Circuit, this can be done in one of four ways:

> (1) reliance upon federal cases employing constitutional analysis;
>
> (2) reliance upon state cases employing federal constitutional analysis;
>
> (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or
>
> (4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (paragraph breaks added).

Failure to exhaust occurs where state court remedies are still "available at the time of the federal petition." *Williams*, 460 F.3d at 806. This failure to exhaust can also lead to a petitioner procedurally defaulting his claims. If the petitioner has not fully utilized his state remedies and has no legal mechanism by which to do so now, the claim he failed to present is procedurally

defaulted, and this Court cannot act on the claim either. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Williams*, 460 F.3d at 809.

**B. Procedural Default**

The procedural default doctrine limits federal review if the petitioner has failed to follow the state's procedural requirements for presenting his or her claim in state court. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). This doctrine flows from the insight that courts must have the authority to insist that "defendants present their arguments on time and according to established procedures." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). Thus, a federal habeas court will not consider a habeas petition if "the last state-court judgment denying relief on the claim rests on a procedural state-law ground that is 'independent of the federal question and is adequate to support the judgement.'" *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quotation marks omitted).

This Circuit consults a four-part test to determine whether a petitioner has procedurally defaulted a claim. A petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Because the procedural-default bar to federal habeas review is harsh, courts have created safety-valves to permit review in limited circumstances. A petitioner can obtain review of procedurally defaulted claims if he or she shows: (1) "cause," i.e. that some external factor kept him from complying with the state rule or fairly presenting his claim; and (2) "prejudice," i.e. that, assuming the petitioner's constitutional claim has merit, there is a reasonable probability

that a different verdict would have resulted if the alleged constitutional violation hadn't occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012). A petitioner can also obtain review of a procedurally defaulted claim if the procedurally defaulted claim is based on new evidence that the petitioner was factually innocent of the crime of conviction. *See Coleman*, 501 U.S. at 750 ("fundamental miscarriage of justice" exception to procedural default); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim would establish that the petitioner was "actually innocent."). But "[A]ctual[] innocen[ce]" means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To overcome procedural default, an actual innocence claim must be supported by "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## VII. Discussion

### A. Ground One

In Ground One, Lathan alleges that he was denied due process and the ability to present a meaningful defense under the Sixth and Fourteenth Amendments by the trial court's treatment of two items of evidence: a rap video allegedly depicting the victim threatening Lathan and a detective's report. (ECF Doc. 1-1, pp. 12-21). Respondent argues neither evidentiary issue rose to the level of a constitutional violation, and even so, the detective-report portion of the claim is otherwise procedurally defaulted. (ECF Doc. 9, pp. 20, 29-37).

Although argued together, these are two distinct claims for exhaustion purposes. Fair presentation is claim specific and requires the state court to receive the factual basis of each alleged constitutional violation. *See Wagner*, 581 F.3d at 418. Presentation of a claim concerning

one item of evidence does not fairly present a materially different claim concerning another item of evidence.

**1. Lathan's rap-video claim in Ground One is not cognizable**

Lathan first argues the trial court violated his Sixth and Fourteenth Amendment right to have a meaningful opportunity to present a complete defense by excluding the rap video in which the victim allegedly threatened to kill him. (ECF Doc. 1-1, pp. 12-19).

Lathan challenged the exclusion of the video on direct appeal.[5] His first assignment of error asserted that the trial court improperly excluded evidence relevant to self-defense and thereby deprived him of an opportunity to present a meaningful defense. (ECF Doc. 9-1, pp. 92-100). The Ohio Court of Appeals considered and rejected that claim. (*Id*. at pp. 210-17; *see also Lathan*, 2024 WL 3221526 (Ohio Ct. App., June 28, 2024)). But, as Lathan notes in both his Petition and his Traverse, the state trial court excluded the video itself under Ohio Criminal Rule 16, while still permitting him to testify about the video should he choose to do so. (*See* ECF Doc. 1-1, p. 19; ECF Doc. 14, p. 7; *see also* ECF Doc. 9-6, pp. 2-8 (trial transcript ruling on motion to introduce rap video)).

Federal habeas corpus relief "does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and this Court is bound by the state court's interpretation of state law. *See*, *e.g.*, *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). "Federal courts must defer to a state courts interpretation of its own rules of evidence and procedure" when considering a habeas petition. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)

[5] Lathan argues the federally accepted prison-mailbox rule establishes cause and prejudice sufficient to excuse the procedural default caused by not timely presenting his direct appeal to the Supreme Court of Ohio on Grounds One through Three. (*See* ECF Doc. 1-1, pp. 6-8). Since those grounds are not cognizable here, I do not address whether procedural default of this ground is excused.

A claim grounded in error of state law is therefore cognizable only to the extent that the "error amounts to a fundamental miscarriage of justice or a violation of the right to due process." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008). "In general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review," but habeas relief may be granted if "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due process violation." *Wood v. Morrison*, 2021 WL 1327841, at *3 (6th Cir. Jan. 11, 2021); *see also Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).

Despite Lathan's argument otherwise, the question before this Court is limited to whether the exclusion of the video pursuant to state procedural rules was so fundamentally unfair that it rose to the level of a due process violation. A state court evidentiary ruling generally does not rise to the level of a due process violation unless it offends a principle of justice so rooted in the tradition of the country as to be considered fundamental. *Moreland*, 699 F.3d at 923.
Lathan has not made that showing. In his Petition and Traverse, Lathan argues the rap video was excluded under Ohio Criminal Rule 16, and that the state trial court judge erred by failing to consider the Papadelis factors. (ECF Docs. 1-1, pp. 15-17; 14, pp. 7-8 (citing *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1)). Lathan centers his argument on this error of state law to show that he was "improperly deprived of the opportunity to present additional evidence to support his self-defense claim." (ECF Doc. 1-1, p. 15). He asserts that exclusion of the video was not harmless error and impacted his right to "'a meaningful opportunity to present a complete defense'" under the Sixth and Fourteenth Amendments. (*Id.* at p. 17 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). These arguments are insufficient to show that the trial court's ruling on a state evidentiary issue so offended a fundamental principle of justice as to cause a due process violation. Under these circumstances, the exclusion of the rap video did not

render Lathan's trial fundamentally unfair. At most, Lathan alleges that the trial court incorrectly applied Ohio's discovery and evidentiary rules by excluding evidence that would have corroborated his testimony. However, such an alleged error of state law does not provide a basis for federal habeas relief.

I therefore find that the rap-video portion of Ground One does not rise to the level of a federal due process violation and is not cognizable in federal habeas corpus. I recommend that this portion of Ground One be dismissed.

**2. Ground One is also not cognizable as to Detective Sharp's report**

Lathan also alleges in Ground One that the trial court's treatment of a detective's report violated his right to a meaningful defense. (ECF Doc. 1-1, pp. 19-21). Unlike the rap video claim, Lathan never raised the issue regarding Detective Sharp's report to the Ohio Court of Appeals. (*See* ECF Doc. 9-1, pp. 92-100; *see also Lathan*, 2024 WL 3221526 (Ohio Ct. App., June 28, 2024)).

Even absent Lathan's failure to present this claim to the state courts, Lathan's conclusory invocation of the Sixth and Fourteenth Amendments would not transform a trial court's decision to not give jurors a detective's report during deliberation into a cognizable federal claim. As discussed above, Lathan must demonstrate the ruling was so egregious that it rendered the entire trial fundamentally unfair. *See Moreland* 699 F.3d at 923. Lathan has not demonstrated the choice not to give the jurors Detective Sharp's report during deliberation prevented him from presenting a defense or otherwise rendered the trial fundamentally unfair.

For these reasons, I recommend this portion of Ground One be dismissed as noncognizable.

**B. Ground Two is not cognizable.**

In Ground Two, Lathan asserts that his convictions were not supported by sufficient evidence. (ECF Doc. 1-1, pp. 21-32). On direct appeal, however, his second assignment of error stated only that his conviction was against the manifest weight of the evidence. (ECF Doc. 9-1, pp. 100-09). The substance of the argument on direct appeal was that the jury lost its way in rejecting Lathan's self-defense claim. (*Id*.). Respondent argues the manifest weight portion of Ground Two is not cognizable in federal habeas, and the sufficiency argument is likewise not cognizable since self-defense is not an element of the offense. (ECF Doc. 9, pp. 37-43).

A claim that a conviction is against the manifest weight of the evidence arises solely under state law and is not cognizable in federal habeas corpus. *Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1976). A manifest-weight claim asks a reviewing court to weigh the evidence, assess witness credibility, and determine whether the factfinder lost their way; it does not present the federal due process inquiry established in *Jackson v. Virginia*, 443 US. 307, 319 (1979). The Sixth Circuit has, however, indicated it may be appropriate to liberally construe a pro se petitioner's petition to construe a manifest weight argument as a sufficiency of the evidence argument where the state court's determination necessarily included a finding of sufficient evidence. *Nash v. Eberlin*, 258 F. App'x 761,764 n.4 765 (6th Cir. 2007).

The Supreme Court of Ohio has held that self-defense remains an affirmative defense, not an element of the charged offense, even though Ohio law now places the burden to prove a defendant was not acting in self-defense on the prosecution. *State v. Messenger*, 216 N.E.3d 653, 660 (Ohio 2022). Further, the State's burden to disprove self-defense is reviewed under the manifest-weight standard, not under the sufficiency standard. *Id.*

Consistent with *Messenger*, the Sixth Circuit has held that a sufficiency of the evidence argument directed only to the jury's rejection of a self-defense claim is not cognizable on federal habeas review. *Smith v. Smith*, No. 24-3251, 2024 WL 4287901, *2-3 (6th Cir. July 2, 2024). The due-process sufficiency guarantee concerns proof of the statutory elements of the offense. It does not require constitutionally sufficient proof of the nonexistence of an affirmative defense. *Caldwell v. Russell*, 181 F.3d 731, 740-41 (6th Cir. 1999).

On this basis, I therefore determine that Ground Two is best presented here as a manifest-weight claim and do not construe it as a sufficiency-of-the-evidence claim. Relabeling the argument as "insufficient evidence" does not change its substance.

Here, Lathan does not contend that the State failed to prove that he caused the victim's death or committed the conduct constituting the charged offense. (ECF Doc. 1-1, pp. 23-24). Rather, he admitted to shooting the victim and argues the shooting was justified. (*Id.* at pp. 23-24). His federal claim still concerns the jury's rejection of his self-defense claim, just as his manifest-weight-of-the-evidence claim did in state court. (*Id*. at p. 26). To the extent Ground Two challenges the manifest weight of the evidence, it presents only a question of Ohio law. To the extent it challenges the State's failure to disprove self-defense, it does not implicate the federal sufficiency guarantee. Nor should Lathan's manifest-weight claim be construed as a federal sufficiency claim. I therefore recommend that Ground Two be dismissed as noncognizable.

**C. Lathan's Third Ground for Relief is noncognizable.**

In Ground Three, Lathan challenged the denial of his motion for a new trial based on Juror Number Seven's prior acquaintance with defense counsel's wife. (ECF Doc. 1-1, pp. 32-40). He alleges the trial court's ruling violated his due process rights under the Fourteenth Amendment. (*Id*.). Respondent argues that a denial of a motion for a new trial is generally a state

law claim and is only cognizable in federal habeas if the ruling was egregious, and asserts Lathan cannot meet that demanding standard. (ECF Doc. 9, pp. 43-49).

Lathan's assignment of error on direct appeal asserted that the trial court erred by denying his motion under Ohio Criminal Rule 33. (ECF Doc. 9-1, p. 109). The body of the argument relied on Ohio law governing motions for a new trial and juror misconduct cases arising out of state law. Lathan did not develop a federal constitutional analysis or cite to federal cases concerning due process rights or the Sixth Amendment. (*Id*. at pp. 109-13).

As provided above, a habeas petitioner must first give state courts a fair opportunity to review their claims. *See, e.g., O'Sullivan*, 526 U.S. at 844. To fairly present a claim in state court and preserve the matter for federal habeas review, the petitioner must provide the state court with the basis for his claim in a way that alerts the state court of the alleged federal constitutional error. *See, e.g., Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 276 (1971). This is because "[s]tate courts, like federal courts, are obliged to enforce federal law." *O'Sullivan*, 526 U.S. at 844. Therefore, "state courts should have the first opportunity to review [a petitioner's] claim and provide any necessary relief." *Id*.; *see also Shinn v. Ramirez,* 596 U.S. 366, 378 (2022) ("Exhaustion affords States an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights . . . .") (internal quotations and marks omitted).

In *Pudelski v. Wilson,* 576 F.3d 595 (6th Cir. 2009), the petitioner framed the denial of a motion for new trial as a federal due process violation. However, his state court argument was presented only under Ohio Criminal Rule 33 and state evidentiary standards. *Id*. at 610-11. The Sixth Circuit held the federal claim was procedurally defaulted because the state court had never been asked to rule upon the federal constitutional claim. *Id*. at 605.

Lathan founds the error in Ground Three as a due process violation of his rights under the Fourteenth Amendment. (ECF Docs. 1, p. 8; 1-1, pp. 32-40). But Lathan makes no reference to the Fourteenth Amendment or raise a federal due process claim in his state direct appeal. (*See* ECF Doc. 9-1, pp. 109-13). Searching the state appellate brief for any federal claim, Lathan makes only a passing citation to the Sixth Amendment. (*See* ECF Doc. 9-1, p. 112 (citing to both Ohio Const., Art. I, Sec. 10 and U.S. Const., Am. 6)). But he makes no Sixth Amendment claim here in Ground Three. (*Compare* ECF Doc. 1-1, pp. 32-40 *with* ECF Doc. 9-1, pp. 109-13). On this basis alone, Lathan has failed to fairly present a constitutional claim on the same basis in state review as he does in his federal habeas petition.

But the cursory citation to the Sixth Amendment was not developed enough to alert the state court of the federal constitutional error. *See McMeans*, 228 F.3d at 682 (finding that "a few brief references" to the constitutional claim in state cases was not enough to put state courts on notice of a federal constitutional claim, and holding that the petitioner had failed to fairly present the claim to the Ohio courts). Instead, throughout his brief on direct appeal, Lathan developed the argument that the trial court erred under Ohio Criminal Rule 33, and cited to Ohio cases in support. (*See* ECF Doc. 9-1, pp. 109-13). He did not develop a federal constitutional theory or cite to cases based on federal law. (*Id.*). Without sufficient development, the state appellate court was not given the opportunity to first rule on any Sixth or Fourteenth Amendment claims. The federal constitutional claim is therefore not fairly presented and is procedurally defaulted.

I recommend Lathan's claim on Ground Three is dismissed as procedurally defaulted because Lathan did not fairly present a federal claim to the state courts. Further, because Lathan presented this Ground to the state court as an error under Ohio Criminal Rule 33, the claim lies

only in an error of state law and is not cognizable here. I therefore recommend dismissing the Ground Three as noncognizable.

### D. Lathan's Grounds Four, Five, and Six were not fairly presented to the state court and are now procedurally defaulted.

In Grounds Four through Six, Lathan alleges that trial counsel rendered ineffective assistance of counsel by: failing to timely present exculpatory evidence, failing to put forth a material witness, and allowing a biased juror to be empaneled. (ECF Doc. 1, pp. 10-15). Respondent argues that Lathan procedurally defaulted these claims because Grounds Four, Five, and Six are based on the trial court record and should have been raised on direct appeal and are now barred by res judicata. (ECF Doc. 9, pp. 129-33). Respondent also argues Lathan cannot establish cause and prejudice to excuse his default. (*Id*.).

Lathan acknowledges he failed to raise these claims to the Supreme Court of Ohio, but he argues his procedural default should be excused for three reasons: First, he argues the institution where he was held did not timely mail his direct appeal to the Supreme Court of Ohio (ECF Doc. 1-1, pp. 6-8); Second, the procedural default of Grounds Four, Five, and Six were the result of ineffective assistance of appellate counsel for failing to raise those grounds on direct appeal (*id.* at pp. 8-9); and third, the state appellate court mailed the decision on his Rule 26(B) motion to the wrong address, preventing his ability to timely appeal to the Ohio Supreme Court (*id.* at pp. 9-12).

#### 1. Grounds Four, Five, and Six are unexhausted, no state remedy is available, and all three claims are now procedurally defaulted.

Having reviewed the record, Lathan did not raise his ineffective assistance of trial counsel claims to the state court on direct appeal. (*See* ECF Doc. 9-1, p. 89 (listing the assignments of error on direct appeal)). Lathan later attempted to raise the ineffective assistance

of trial counsel arguments before the state appellate court in his Rule 26(B) motion, couched in that brief as ineffective assistance of appellate counsel claims for failing to raise the errors in his direct appeal. (ECF Doc. 9-1, pp. 290-97). He did not appeal the appellate court's Rule 26(B) decision to the Ohio Supreme Court. (*Id.* at pp. 358-59 (Ohio Supreme Court docket entries)).

The exhaustion requirement demands that Lathan first utilize any state court process available prior to presenting that claim in federal habeas proceedings. *Brandon v. Stone*, 226 F. App'x. 458, 460 (6th Cir. 2007) ("exhaustion requires a petitioner to present his or her legal theory to the state courts before seeking federal relief."). Claims must also be raised to each and every level of state court review. *Wagner*, 581 F.3d at 418 ("For a claim to be reviewable at the federal level, each claim must be fairly presented at every stage of the state appellate process."). However, exhaustion only applies if the remedy is still available at the time of the federal petition. *Engle v. Isaac*, 456 U.S. 107, 125, n.28 (1982). Exhaustion "is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Gray*, 518 U.S. at 161-62 (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Even so, such claims are barred from federal habeas review, unless the petitioner can show that cause and prejudice excuses the default. *Id.*

Here, Lathan did not properly present the ineffective assistance of trial counsel claims at the first opportunity to do so, in his direct review. (ECF Doc. 9-1, pp. 83-114). These claims are therefore unexhausted on the basis of fair presentation. Direct review has concluded, and Lathan no longer has means to raise an ineffective assistance of trial counsel claim. Thus, having failed to exhaust his claims, and now having no remedy available to him, Grounds Four, Five, and Six are procedurally defaulted.

**2. Cause and prejudice does not excuse the procedural default of Grounds Four, Five, and Six.**

Lathan attempts to excuse procedural default of Grounds Four, Five, and Six through his ineffective assistance of appellate counsel claims, and by stating that the state appellate court failed to timely mail him a copy of the state appellate court decision on his Rule 26(B) motion. (ECF Doc. 1-1, pp. 8-12).

First, Lathan's ineffective assistance of appellate counsel claim does not serve to excuse the procedural default of the ineffective assistance of trial counsel claims in Grounds Four, Five, and Six. An ineffective assistance of appellate counsel claim "must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) (quoting *Murray v. Carrier*, 477 U.S. 478, 489 (1986)). An ineffective assistance of counsel claim is not immune from fair presentation, exhaustion, or procedural default requirements merely by its use in a cause-and-prejudice assertion. *Id.* at 452-53. On this basis, an ineffective assistance of counsel claim that is itself procedurally defaulted may not serve to excuse the procedural default of other grounds for relief. *Id.* at 453.

Here, the ineffective assistance of appellate counsel claims are themselves procedurally defaulted, and cannot serve as cause to excuse the default of the ineffective assistance of trial counsel claims. Lathan did not present the claims to each and every level of state court review after his Rule 26(B) motion was denied. (ECF Doc. 9-1, pp. 89, 358-59). He did not appeal that decision to the Ohio Supreme Court, and the time for appeal has passed. *See* Ohio S.Ct. Prac.R. 7.01 (providing 45 days from the appellate court judgment entry for a timely notice of appeal in the Ohio Supreme Court). Thus, having failed to exhaust his claims, and now having no remedy available to him, the ineffective assistance of appellate counsel claims are procedurally defaulted, and do not provide excuse to permit this court to review Grounds Four, Five, and Six.

For similar reasons, Lathan's statement that he did not timely receive the appellate court's decision regarding his Rule 26(B) motion does not serve as cause to excuse the defaulted claims. There is no evidence to show that Lathan attempted to raise his ineffective assistance of appellate counsel claims before the Ohio Supreme Court, either timely or untimely. Any cause for the default of these claims therefore rests with Lathan himself.

Cause must show that an objective, external factor impeded efforts to comply with the state's procedural requirements, and that prejudice resulted from the default. *Lundgren*, 440 F.3d at 763-64. In the end, Lathan himself failed to raise the issues before all levels of state court review; any prejudice that might result also rests with him. Therefore, Grounds Four, Five, and Six remain procedurally defaulted.

**E. Actual innocence does not apply to excuse Lathan's procedural default.**

Lathan argues that the rap video and Detective Sharp's report establish his actual innocence and permits review of his procedurally defaulted claims. (ECF Doc. 1-1, pp. 1-2). Respondent argues Lathan cannot establish actual innocence because self-defense speaks to legal, not factual innocence. (ECF Doc. 9, pp. 24-25).

Actual innocence is not ordinarily a freestanding basis for habeas relief; rather, it looks to allow review of a petitioner's constitutional claims if his case implicates a fundamental miscarriage of justice. *Schlup*, 513 U.S. at 314-15. Thus, an actual innocence claim operates as a narrow gateway through which a petitioner may obtain a review of otherwise barred constitutional claims. *Id*. at 315-16. To pass through that gateway, a petitioner must present new, reliable evidence that was not presented at trial. *Id*. at 324. The standard is demanding and applies only in extraordinary cases. *Id.*

Furthermore, actual innocence means factual innocence, not merely legal insufficiency. *Bousley*, 523 U.S. at 623. And a claim of self-defense does not speak to actual innocence of the crime. *Harvey v. Jones*, 179 F. App'x 294, 298-99 (6th Cir. 2006) (collecting cases). "[S]elf-defense demonstrates legal innocence, not actual innocence, because it does not show that the petitioner was factually innocent of killing the victim." *Valentin v. Tanner*, No. 23-1207, 2023 WL 5748143, at *6 (6th Cir. Sep. 1, 2023).

Lathan does not deny that he shot the victim; rather, he argues the shooting was justified because he acted in self-defense, and that the rap video corroborates his testimony concerning the victim's prior threats. (ECF Doc. 14, p. 3). Since all of Lathan's arguments regarding actual innocence are based on self-defense, he has not established that he was factually innocent of the crime. Furthermore, the rap video is not the type of new, reliable evidence to satisfy the demanding standards for actual-innocence review of his claims. *See Schlup*, 513 U.S. at 324.

For these reasons, I recommend the District Court conclude the petitioner has not satisfied the actual innocence gateway and that his asserted innocence does not excuse any procedural default.

## VIII. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1)(A), this Court will grant a certificate of appealability ("COA") for an issue raised in a § 2254 habeas petition only if the petitioner has made a substantial showing of the denial of a federal constitutional right. *Cunningham v. Shoop*, 817 F. App'x 223, 224 (6th Cir. 2020). A petitioner satisfies this standard by demonstrating that reasonable jurists "could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (internal quotation marks omitted).

When a claim is dismissed on procedural grounds, the petitioner must demonstrate both that reasonable jurists could debate the procedural ruling and that the petition states a debatable claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists would not debate that Lathan's rap-video claim and detective-report claim did not arise to the level of a constitutional violation in Ground One; that Ground Two presents a noncognizable manifest-weight claim; that Lathan failed to present a constitutional claim to the state court in Ground Three; or that Grounds Four through Six are procedurally defaulted and cause and prejudice nor actual innocence do not serve to excuse the procedural default of his claims.

Thus, if the District Court accepts my recommendations, Lathan will not be able to show that my conclusions in this Report and Recommendation are debatable. Therefore, I recommend that no certificate of appealability issue in this case.

## IX. Recommendation

For the foregoing reasons, I recommend Grounds One, Two, and Three be dismissed as noncognizable state law claims; and Grounds Four, Five, and Six be dismissed as procedurally defaulted. I further recommend that the District Court find that Lathan has not established actual innocence sufficient to excuse any default, and deny his request to expand the record. I further recommend Lathan be denied a certificate of appealability.

Dated: September 10, 2026

REUBEN J. SHEPERD
UNITED STATES MAGISTRATE JUDGE

# OBJECTIONS

## <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs*., 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).